UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SUSANNA MIRKIN, *et al.*,
      Plaintiffs,

          v.

VIRIDIAN ENERGY, INC.,
      Defendant.

No. 3:15-cv-1057 (SRU)

## RULING AND ORDER

On July 10, 2015, the plaintiffs, Susana and Boris Mirkin, filed a putative class action

against the defendant, Viridian Energy, Inc., alleging violations of N.Y. G.B.L. §§ 349-d(7),

349-d(3), and 349, and unjust enrichment, and asserting that they represented a class that met the

requirements of the Class Action Fairness Act, 28 U.S.C. §§ 1332, *et seq.* (doc. 1) The Mirkins

filed a First-Amended Complaint ("FAC") on December 18, 2015 (doc. 47), replacing the unjust

enrichment claim with claims for breach of contract and of the implied covenant of good faith

and fair dealing. On January 8, 2016, Viridian filed the instant motion to dismiss. (doc. 48) I held

a hearing on Viridian's motion on April 19, 2016. (doc. 70)

For the following reasons, I now **grant** the motion to dismiss the section 349-d(7) claim

(Count One) because the disclosures were adequate. I **grant** the motion to dismiss the implied

covenant claim (Count Five) because the parties appear to agree that it is subsumed under the

breach of contract claim under New York law. I **deny** the motion to dismiss the section 349 and

349-d(3) claims (Counts Two and Three), which are largely identical, because the plaintiffs have

alleged sufficiently specific and quantifiable misstatements, and have further alleged that those

misstatements caused them to pay more money on electricity than they otherwise would have

done. Finally, I **deny** the motion to dismiss the breach of contract claim (Count Four), because

the plaintiffs have adequately alleged that Viridian either did not set variable rates in the manner to which it agreed, or exercised the discretion to do so in bad faith.

## I.      Standard of Review

### A.  Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very

remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.    Background

The following facts are alleged in the First-Amended Complaint: Viridian Energy, Inc.

("Viridian") is an Energy Service Company ("ESCO"), and a participant in the market that arose

following the deregulation of New York's residential gas and electricity markets. FAC at ¶¶ 1, 4,

5. Relevant to this action, Viridian markets itself as providing "green" energy at "competitive"

prices. *Id.* at ¶ 5. Viridian is incorporated under Nevada law and has its principal place of

business in Stamford, Connecticut. *Id.* at ¶¶ 18, 31.

Susana and Boris Mirkin are married and reside in Brooklyn, New York. *Id.* at ¶ 17. In

the fall of 2013, one of Viridian's direct-marketing associates showed the Mirkins standardized

Viridian marketing materials including a brochure about Viridian's commitment to

sustainability, *id.* at ¶ 39, Ex. 3, and a brochure entitled "Affordable Green Energy," *id.* at ¶ 39,

Ex. 4.[1] The Sustainability Brochure does not make any direct references to Viridian's rate plans,

but does describe the company's "mission" as follows: "Viridian was built on the idea that

customers should never have to choose between affordability and sustainability." *Id.* at Ex. 3.

The "Affordable Green Energy" Brochure also does not directly lay out Viridian's rates. It states

that Viridian provides green energy at "competitive prices," and that "[i]n fact, the average

Everyday Green customer saves money on energy costs over time." *Id.* at Ex. 4. In smaller font

on the back of the brochure, following a list of Viridian's licensing numbers, it also states:

"Viridian may offer two rate plans: variable rates which are subject to change based on market

conditions and fixed rates which are fixed for an agreed upon number of billing cycles. Current

---

[1] The plaintiffs allege on information and belief that they were shown those documents, or something substantially
similar. FAC at ¶ 39.

rates should not be construed as a guarantee of future rates or savings." *Id.* The Viridian associate, using those materials, "convinced the Mirkins that Viridian's green energy was less expensive than conventional energy and was competitively-priced." *Id.* at ¶ 38. As a result, Susana Mirkin signed up with Viridian for the couple's joint energy bills.[2] *Id.*

On October 16, 2013,[3] Viridian mailed Ms. Mirkin the aforementioned Sustainability Brochure, a "Welcome Letter," *id.* at ¶ 40, Ex. 2, and a copy of its Terms and Conditions, *id.* at ¶ 40, Ex. 8. The main body of the Welcome Letter states that once Viridian service begins, Ms. Mirkin will be "doing your part to do something better for the environment while saving money on your energy costs at the same time." *Id.* at Ex. 2. In slightly smaller text in a box on the side of the page, the letter also states that Ms. Mirkin had enrolled in a "6-Month Fixed Rate plan" for 8.99 cents per kilowatt hour during that period with a "$50 Early Termination Fee." *Id.* The letter goes on to state that "[a]t the end of your term, your service will continue on a month-to-month basis on a variable rate." *Id.*

The Terms and Conditions document ("T&C"), which consists of three pages of relatively small font, makes the following relevant statements:

- The T&C and welcome letter "supersede any oral or written statements made in connection with the Agreement or the Service."

- For customers with a fixed-term plan, it states in four locations that at the end of the fixed number of billing cycles set out in the welcome letter and/or any other Renewal term to which the parties agree, "the Agreement will continue with

---

[2] Mr. Mirkin is not a party to the agreement with Viridian, but the FAC states that he also "participated in the decision to switch" to Viridian. *Id.* at ¶ 38. At the hearing, the parties appeared to concede that Mr. Mirkin's standing was not disputed at this stage of the proceedings.

[3] The FAC states the date as 2015, but that appears to be a typographic error based on both the chronology of the complaint and the letter itself. *Id.* at Ex. 2.

respect to such Service month-to-month with a variable rate" until the Agreement
is terminated by either party.

- The variable rate under Viridian's "Everyday Green" plan, in which Ms. Mirkin
  apparently enrolled, is described as follows: "Your price may fluctuate from
  month-to-month based on wholesale market conditions applicable to the LDU's
  [Local Distribution Utility] service territory. The variable price for Electric
  Service each month will be calculated by multiplying the variable price of
  electricity per kilowatt hour (kWh) that month by the amount of electricity you
  use in the billing cycle plus any applicable fees, charges or taxes."

- "Viridian's prices may be higher or lower than the LDU's rate in any given
  month."

- "This Agreement offers no guaranteed savings."

- In two locations, the T&C provides a rescission clause, stating: "You have the
  right to cancel the Agreement, without fees or penalties of any kind, within three
  (3) business days of receiving the Agreement."

Ms. Mirkin apparently did not cancel the agreement following receipt of those
documents. She received six months of Viridian service at the fixed-term rate of 8.99 cents per
kilowatt hour. *Id.* at ¶ 41. For the billing period from June 11, 2014 through July 10, 2014,
Viridian charged Ms. Mirkin 15.4889 cents per kilowatt hour. *Id.* at ¶ 42. For the billing periods
ending in August and September 2014, Viridian charged Ms. Mirkin 16.49 cents per kilowatt
hour. *Id.* Ms. Mirkin then apparently terminated her Agreement with Viridian. *See id.* at ¶ 43.
During that three-month period, Ms. Mirkin paid $60.28 more than she would have paid based
on her local utility's rate. *Id.* at ¶ 43. The Mirkins also allege that Viridian's rates increased or

stayed the same even when the average wholesale market price for the region decreased. *Id.* at ¶

47.[4] Apparently as a result of that discrepancy, the plaintiffs allege that Viridian's variable-rate

plan is not based on "wholesale market conditions." *Id.* at ¶ 95.

The plaintiffs seek certification of the class of similarly situated Viridian customers in

New York, monetary relief under N.Y. G.B.L. §§ 349-d and 349, compensatory and punitive

damages, and an injunction prohibiting Viridian from continuing the allegedly deceptive

marketing practices described in the complaint.

## III.   Discussion

### A.   N.Y. G.B.L. § 349-d(7) (Count I)

New York General Business Law section 349-d, also known as the "Energy services

company consumers bill of rights," regulates ESCOs. Subsection (7) provides that: "In every

contract for energy services and in all marketing materials provided to prospective purchasers of

such contracts, all variable charges shall be clearly and conspicuously identified." The parties

dispute whether section 349-d(7) should be read literally, which would potentially require a

disclosure of all possible variable charges on *all* marketing materials, or whether it requires

disclosure "only where an energy supplier advertises a specific rate or rate plan," *see* Def.'s Br.

at 12. The parties also dispute whether the disclosures Viridian did make were sufficiently "clear

and conspicuous" to meet the statute's requirements.

1.   *Viridian is not required to identify all variable rates on* all *marketing.*

Viridian concedes that it does not identify its variable rate plans on *all* of the materials

attached to the FAC, including the Sustainability Brochure, FAC Ex. 3. But Viridian argues the

_____

[4] The plaintiffs also discuss other Viridian marketing materials, but do not allege that they saw those before
enrolling in Viridian's plan or deciding whether or not to rescind the agreement. *See* FAC at ¶ 50 (discussing Exs. 1,
5, 6). Because there was no harm caused by materials that the plaintiffs never saw, those documents will not be
further discussed.

statute, if read literally, would yield the absurd result that Viridian would be required to place a discussion of its variable rates on every single marketing item it provided to the public. To avoid that result, it points to comments by Assemblyman Michael N. Gianaris, a sponsor of the bill, explaining that subsection (7) requires that "all variable charges must be clearly and conspicuously identified *as such* . . . ." Def.'s Br. at 12, Ex. E at 70 (emphasis added). Viridian interprets that comment to mean that disclosure of a variable rate plan is required only where "a specific rate or rate plan" is identified. Def.'s Br. at 12.

The plaintiffs rely heavily on the plain language of the statute. Pls.' Opp'n Br. at 7. They also argue that the statute should be construed broadly because it is remedial, *id.* at 8; that the materials at issue could be covered by the statute without inviting the absurd results that Viridian describes, *id.* at 9; and finally, that the legislative history underscores that the purpose of the statute was to protect consumers against predatory and deceptive use of teaser rates, which would suggest a robust application of subsection (7), *id.* at 10–11.

Viridian is correct that a literal reading of the statute could lead to absurd results, and perhaps incoherent notices to consumers—it certainly cannot be the case that New York intended to require every ESCO that provides *any* kind of variable rate plan to disclose that fact on all of its marketing. Instead, I read the statute to include two limitations: (1) I read the phrase "provided to prospective purchasers" as a limitation, which requires disclosure of potential variable rates on all materials directly provided *to consumers* (as opposed to, for instance, ads on buses); and (2) as Viridian proposes, I read the requirement to apply *only* where the material refers to a specific rate structure.

The former limitation is supported in the legislative history by a change from the 2009 version of the statute to the final version: the 2009 version, which included the relevant language

in section (6) as follows: "In every contract for energy services and *all* materials used to market such contracts, all variable charges shall be clearly and conspicuously identified." Def.'s Br., Ex E at 15 (emphasis added). The shift in the final bill to "materials provided to prospective purchasers" suggests that the drafters of the bill wanted to avoid requiring disclosure in the full range of marketing materials, such as general audience advertisements and merchandise.

Viridian's further limitation, requiring disclosure only when there is a specific rate structure at issue, also makes sense. It is hard to imagine how requiring such a disclosure would make sense *unless* the document referred to a specific rate structure—in fact, the vague disclosure in the "Affordable Green Energy" brochure, FAC, Ex. 4, is a good example of how a broader requirement would lead to confusing results for any ESCO that offered both variable and non-variable plans. In that brochure, Viridian states that it "may offer two rate plans." *Id.* But because that disclosure arrives without reference to any specific plan, as the Mirkins suggest, it is unclear how that statement would help a consumer figure out in which plan *she* is actually enrolling, or the details of said plan. Instead, I find the best reading of the statute is that disclosure of a variable rate plan is required only when a *specific* plan is actually being discussed in the contract or marketing materials. Disclosure in those materials should be wholly sufficient to avoid the problem that the bill was apparently enacted to solve—a consumer drawn in by promises of low fixed rates, who is then surprised with a variable term after she is locked into a contract.

  2.  *The variable terms were clearly and conspicuously disclosed.*

Based on the above, I thus consider whether the variable terms were "clearly and conspicuously disclosed" only in those materials that discuss a specific rate plan, here the Welcome Letter and the T&C, FAC Exs. 2 and 8. The parties both refer to the Federal Trade

Commission's ("FTC") multi-factor test for determining whether a disclosure is sufficiently

"clear and conspicuous," which test is described in its "Dot Com Disclosures" and summarized

by an Eastern District of New York court as follows:

> The FTC takes several factors into account in assessing whether a given
> disclosure meets the standard, namely the placement of the disclosure in
> an advertisement and its proximity to the claim it is qualifying; the
> prominence of the disclosures; whether items in other parts of the
> advertisement distract attention from the disclosure, whether the
> advertisement is so lengthy that the disclosure needs to be repeated; . . . ;
> and whether the language of the disclosure is understandable to the
> intended audience.

*United States v. Locascio*, 357 F. Supp. 2d 536, 549 (E.D.N.Y. 2004).

Applying those factors, it is clear that if a reasonable consumer looked at the relevant

documents, she would have seen the variable rate disclosure language. In the Welcome Letter,

the variable rate is called out in a highlighted box entitled: "You have enrolled for the following

rate plan." The box does not include an overwhelming amount of information, and it uses clear

and simple language. That it is written in a slightly smaller font here does not seem sufficient to

render the information hidden from view. The T&C is an even simpler case. It indicates in

several different places, and using the same font that is used for the rest of the text, that the

contract changes to a variable rate plan after the first six months. Two of those places are called

out in a box clearly intended to highlight the most relevant terms to consumers.

Finally, the Mirkins argue that the disclosures are not adequate because section 7 also

required Viridian to identify or explain the basis of the variable rate. Viridian, however, points to

*Wise v. Energy Plus Holdings, LLC*, No. 1:11-cv-7345 (S.D.N.Y.), in which a Southern District

of New York court considered and rejected the same argument. Def.'s Reply Br., Ex. F at 17–18.

The *Wise* court noted that there is no indication in the legislative history that an "explanation" of

the variable rate terms was intended to be required by the statute, and points out it is entirely

plausible that the New York State legislature felt that simply disclosing the fact of variable-rate

terms would be sufficient to improve consumer information and decision-making. Although I am

sympathetic to the plaintiffs' argument that consumers need more detailed information in order

to make an informed decision, reading a requirement to explain the content of the variable terms

into the statute would require me to invent an entire set of rules about what level of detail is

appropriate without any legislative guidance.

The plaintiffs also argue that, because Viridian misrepresented the basis on which its

rates would vary, its disclosure under section 7 that the rates were variable was insufficient.

Because I have determined that section 7 requires disclosure only of the existence of a variable

rate, rather than the basis on which it varies, and because Viridian did apparently disclose which

rates would vary, that argument must fail. I thus **grant** the motion to dismiss the section 349-d(7)

claims.[5]

B.  N.Y. G.B.L. §§ 349-d(3) and 349 (Counts Two and Three)

The parties agree that causes of action under N.Y. G.B.L sections 349 and 349-d(3) have

the same elements. *See Yang Chen v. Hiko Energy, LLC*, 2014 WL 7389011, at *6 (S.D.N.Y.

Dec. 29, 2014) (approving the same stipulation between the parties in that case); *Claridge v. N.*

*Am. Power & Gas, LLC*, 2015 WL 5155934, at *4 (S.D.N.Y. Sept. 2, 2015) (same). In order to

state a claim under either section, the plaintiffs must allege: "first, that the challenged act or

practice was consumer-oriented; second, that it was misleading in a material way; and third, that

the plaintiff suffered injury as a result of the deceptive act." *Yang Chen*, 2014 WL 7389011, at

*3 (internal quotation marks and citation omitted). Viridian challenges the second element on

grounds that the statements at issue are non-material because they are puffery, or are not

---

[5] Because I have dismissed the section 7 claim, I do not address the plaintiffs' argument that section 7 is a strict liability statute.

misleading because of other disclosures in the materials. It also challenges the third element on

the basis that the Mirkins have failed to allege causation.

### 1. *Misleading Statements*

The Mirkins point to the statements alleged in paragraphs 5–10 of the FAC as materially

misleading. Those statements include variations on the claim that Viridian customers will be able

to "save money while helping the environment," FAC at ¶ 5; "in fact, the average Everyday

Green customer saves money on energy costs over time," *id.*; statements that Viridian offers

"clean energy choices at competitive prices," *id.* at ¶ 6, 9; and a suggestion that the introductory

teaser rate is itself tantamount to a misleading statement, *id.* at ¶ 8. The Mirkins may be

suggesting that Viridian's statement that the variable rate "may fluctuate from month-to-month

based on wholesale market conditions" also constitutes a misleading statement. *See* FAC, Ex. 8.

Viridian first argues that those statements are non-actionable puffery. The statements that

Viridian will allow customers to "save money" or that it will offer "competitive" rates are too

vague to be actionable. *See Daniyan v. Viridian Energy LLC*, 2015 WL 4031752, at *2 (D. Md.

June 30, 2015); *Urbino v. Ambit Energy Holdings, LLC*, 2015 WL 4510201, at *5 n.7 (D.N.J.

July 24, 2015) (same, collecting New Jersey cases); *see also Oladapo v. Smart One Energy,

LLC*, 2016 WL 344976, at *3 (S.D.N.Y. Jan. 27, 2016) (under Maryland law, drawing a

distinction between claims that rates would be set "in response to changing gas market

conditions" and promises of "savings" or "competitive rates").

Two of the statements cited by the plaintiffs, however, are clearly susceptible to

quantification—specifically, Viridian's statement that "in fact, the average Everyday Green

customer saves money on energy costs over time," and the statement that the rate "may fluctuate

from month-to-month based on wholesale market conditions."[6] Drawing all inferences in favor

of the plaintiffs, the former statement can be reasonably understood as a promise that the average

Everyday Green customer saves money as compared to the utilities or other Viridian competitors

over a time period that is longer than just the introductory rate, a fact that can be verified by

statistical analysis. Similarly, discovery will be able to uncover whether Viridian's rates are in

any way based on market conditions. *See Yang Chen*, 2014 WL 7389011, at *4 (finding

actionable misstatement where plaintiffs plausibly alleged that defendants' rates were not, in

fact, reflective of the wholesale cost of electricity); *see also Claridge*, 2015 WL 5155934, at *5

(finding actionable misstatement where defendant stated that variable rate "would approximate

the market price," but failed to match the rate of other ESCOs).

Having determined that at least two of the alleged misstatements are actionable, I also

reject Viridian's argument that its additional disclosures cure the misstatement. "Where a

defendant fully discloses the terms and conditions of a transaction, New York courts have found

that the defendant's conduct is not materially misleading." *Delgado v. Ocwen Loan Servicing,*

*LLC*, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) (citations omitted). "However, '[a]

solicitation may be likely to mislead by virtue of the net impression it creates even though the

solicitation also contains truthful disclosures.'" *Id.* (quoting *F.T.C. v. Cyberspace.com LLC,* 453

F.3d 1196, 1200 (9th Cir. 2006)). "Courts have also found that the mere presence of an accurate

disclaimer does not necessarily cure other potentially misleading statements or representations

on a product or advertisement." *Id.* (citations omitted).

---

[6] At one point in its brief, Viridian suggests that the "may" refers to whether the fluctuation will be based on market conditions, rather than whether the rate will fluctuate at all. *See* Def.'s Br. at 33. Elsewhere, however, it appears to endorse the latter interpretation, which is the most natural reading of the sentence—namely that the rates *may* fluctuate from month to month, but if they do so, the fluctuation will be based on market conditions. *See id.* at 15 (stating that "their rates may fluctuate from month-to-month," and making no reference to the remainder of the clause); 19 ("Viridian's identification that it offers a variable rate that may fluctuate month-to-month," and making no reference to the remainder of the clause). And, as I stated at the hearing, that reading is further underscored by the fact that there is only one "factor" listed on which basis the price may fluctuate.

Viridian points out that in the T&C, it states that "[t]his Agreement offers no guaranteed savings," and that its prices "may be higher or lower that the LDU's [Local Distribution Utility] rate in any given month," FAC, Ex. 8, and that in the "Affordable Green Energy" Brochure, it states in small text on the back that "[c]urrent rates should not be construed as a guarantee of future rates or savings," FAC, Ex. 4. As a preliminary matter, I note that those disclosures would only address the alleged misstatements regarding cost savings, and that Viridian has not pointed to any disclosures that would correct its alleged misstatement that the variable rate will be based on market conditions. Moreover, it appears to be manifestly deceptive for Viridian to declare in large text in the body of the "Affordable Green Energy" Brochure that the average customer "saves money over time," only to dodge that affirmative promise with a much smaller and more obscure disclaimer. FAC, Ex. 4. Similarly, the Welcome Letter and T&C, which were provided to Mirkin at the same time, make contradictory statements about savings: the former brightly promises that Mirkin will be "saving money on [her] energy costs," FAC, Ex. 2, while the latter disclaims any "guaranteed savings," FAC, Ex. 8. That discrepancy is in marked contrast to those two documents' other consistent statements, such as the terms of the variable rate discussed above.  Thus, I reject Viridian's argument that its disclosures cure any misrepresentations, and instead find that the second element has been met.[7]

---

[7] Viridian additionally argues that the T&C integration clause cures any alleged misrepresentations made outside of the T&C. *See* Def's Br. at 20–21. There are two problems with that argument: first, some of the alleged misrepresentations are contained *within* the T&C, such as the statement that the variable rate will be based on "wholesale market conditions." Second, and more importantly, although the integration clause might remove any *contractual* remedies for prior deceptive statements, it does not avoid *statutory* penalties for those practices because it does not cure any deceptive business practices that allegedly lured the plaintiffs into the contract in the first instance. *See Morrissey v. Nextel Partners, Inc.*, 895 N.Y.S.2d 580, 580 n.5 (N.Y. App. Div. 2010) (observing that an integration clause "does not limit the inquiry in a cause of action under General Business Law § 349, since such a claim is based on deceptive business *practices*, not on deceptive contracts") (emphasis in original, citations omitted).

2.  *Causation*

Viridian argues that the Mirkins have failed to show causation because: (1) they have not

adequately alleged that they saw any of the alleged misrepresentations before entering into the

contract with Viridian; and (2) they have failed to allege a cognizable injury. The first argument

can quickly be rejected: at the very least, the plaintiffs have adequately alleged that they saw the

"Affordable Green Energy" Brochure, which contains alleged misstatements, before switching to

Viridian's service.[8] *See* Pls' Opp'n Br. at 37–38; FAC at ¶¶ 39–40.

Viridian's second argument is also unconvincing. The plaintiffs' allegation of causation

is very straightforward: they allege that they entered into a contract with Viridian *because*

Viridian's alleged misrepresentations led them to believe that they would save money. FAC at ¶¶

38; 45. Viridian misreads *Yang Chen* in its reply brief, asserting that the relevant loss caused in

*Yang Chen* was the difference between the contractual price and the price the plaintiffs actually

paid in that case. *See* Def.'s Reply Br. at 11. Instead, *Yang Chen* carefully differentiates between

contractual damages and section 349 damages. The former comprises "the difference between

the amount defendant actually charged plaintiffs and the amount defendant should have charged

them had it based its prices on the factors identified in plaintiffs' contracts." *Yang Chen*, 2014

WL 7389011, at *5. And, as in the present case, the section 349 damages are the losses caused

by the defendant's misrepresentation, which is the amount of money the plaintiffs would have

saved by switching back to the utility. *Id.*

Because the plaintiffs have adequately alleged all three elements of the section 349 and

349(d)(3) claims, I **deny** the motion to dismiss those claims.

---

[8] The parties have not considered the effect of the T&C's rescission clause on the causation issue, but I note that a plausible inference can be drawn that the alleged misstatements contained within the Welcome Letter and T&C caused the plaintiffs not to exercise their rights to rescind the contract.

C. Breach of Contract

The parties seem to agree that the contract at issue consists of the T&C. The Mirkins assert that the contract was breached because it contains an express provision that variable rates will be "based on wholesale market conditions" and Viridian did not actually base its rates on those conditions, as demonstrated by the failure of the charged rates to track wholesale market rates. *See* Pls' Opp'n Br. at 38–39.

The parties' briefs make clear that the plaintiffs' argument, and close variations, have been the subject of considerable conflicting authority. But the plaintiffs' argument is consistent with my previous holdings in the related cases of *Sanborn v. Viridian Energy, Inc.*, 3:14-cv-1731 (SRU), and *Steketee v. Viridian Energy, Inc.*, 3:15-cv-585 (SRU), and I see no reason to change my reasoning. In both cases, I rejected Viridian's substantially similar arguments to dismiss those plaintiffs' breach of implied covenant claims.[9] In *Steketee*, for instance, I held that, under New Jersey law, the plaintiff's allegation that Viridian agreed to a variable rate based on wholesale market conditions and then intentionally took actions to establish a variable rate wholly unrelated to those conditions was sufficient to survive a motion to dismiss. *See* 3:15-cv-585 (SRU) (doc. 46) at 24–29. *But see Windley v. Starion Energy, Inc.*, 2016 WL 197503, at *3 (S.D.N.Y. Jan. 8, 2016) (under New Jersey law, dismissing breach of contract claim, based on plaintiff's claims that the defendant did not adhere to its agreement to use a variable rate that "may change in response to market conditions, including such factors as electricity market pricing, applicable taxes, transmission costs, utility charges and other market price related costs, at [the defendant's] discretion"). It seems clear to me that where one party to a contract has acted

---

[9] Viridian argues in its briefs that *Sanborn* and *Steketee* are not relevant here because those plaintiffs made only implied covenant claims, and did not raise breach of contract claims. But as discussed below, the parties in this case have agreed that the implied covenant claim is *subsumed under* the breach of contract claim, and accordingly, the analysis applies to this case with equal force.

intentionally to exercise its discretion beyond the limits established by the contract and in a

manner that will frustrate the expectations of the other party to that contract, a breach of contract

has occurred.

Viridian largely relies on a series of out-of-state energy cases involving similar, but

distinguishable contractual terms. *See* Def.'s Br. at 32–35; Def.'s Reply Br. at 13–15; Def.'s

Notice of Supp. Auth. (doc. 65); Def.'s Second Notice of Supp. Auth. (doc. 66). First, in

*Daniyan v. Viridian Energy LLC*, 2015 WL 4031752 (D. Md. June 30, 2015), the court rejected

the plaintiff's breach of contract claim at the motion to dismiss stage where the plaintiff

complained only that the defendant had not charged him a "reasonable price." *Id.* at *3. By

contrast, the plaintiffs here complain that Viridian did not follow the explicit term to "base" their

rate on wholesale market conditions. In *Zahn v. N. Am. Power & Gas, LLC*, 2015 WL 2455125

(N.D. Ill. May 22, 2015), and *Orange v. Starion Energy PA, Inc.*, 2016 WL 1043618 (E.D. Pa.

Mar. 16, 2016), the courts rejected the plaintiff's breach of contract claims because both

contracts explicitly provided a list of factors on which the rates could change, but the plaintiffs

focused only on comparisons to the local utility rate. *See Zahn*, 2015 WL 2455125, at *5 ("[The

defendant] promised a variable price that would vary based on 'market prices for commodity,

transportation, balancing fees, storage charges, [the defendant's] fees, *profit*, line losses plus

applicable taxes.'") (emphasis added); *Orange*, 2016 WL 1043618, at *2 ("The contract makes

clear, however, that the rate could change based on conditions in several other territories. . . .

Additionally, the contract states that items other than market pricing, such as transmission costs,

taxes, utility charges and other market price-related factors would be used to determine the

rate."). But in the present case, Viridian did not list factors besides "wholesale market

16

conditions," nor did it point to other "territories." *See Oladapo v. Smart One Energy, LLC*, 2016 WL 344976, at *2 (S.D.N.Y. Jan. 27, 2016) (distinguishing *Zahn* on the same grounds).

In *Silvis v. Ambit Energy L.P*, 2016 WL 1086703 (E.D. Pa. Mar. 21, 2016), the court rejected the plaintiff's breach of contract claim at the summary judgment stage because it determined that: (1) the contract actually granted the defendant "complete discretion to change the rate;" and (2) discovery revealed no proof that the defendant had exercised that discretion in bad faith or engaged in "price gouging." *Id.* at *3–4. The contract at issue here did not give Viridian unfettered discretion, and moreover, at the motion to dismiss stage, the plaintiffs have adequately alleged that Viridian exercised the discretion it was granted in bad faith. *See Yang Chen*, 2014 WL 7389011, at *6 (finding plausible allegations of breach of contractual agreement to base variable rates on specified "market-related factors" where defendant's rate was much higher and increased faster than that of the utility); *Oladapo*, 2016 WL 344976, at *3 (same under Maryland law, where plaintiff alleged that defendant's "prices bore an inverse relationship" to those of the utility).

Viridian also attempts to confuse the issue by arguing that it expressly stated in the T&C that its prices could exceed those of the local utility in any given month. *See* Def.'s Br. at 33. But the difference between the utility and Viridian's rate is *not* at issue in the breach of contract claim. Instead, the damages here would be the difference between what Viridian charged the plaintiffs and what it would have charged if its rates were actually based on "wholesale market conditions." *See Yang Chen*, 2014 WL 7389011, at *5 (distinguishing between breach of contract damages and section 349 damages in the same way).

Viridian's arguments regarding the integration clause run into a similar problem. It argues that, like in *Silvis*, the integration clause cuts off any obligation under the contract to meet

17

promises made beforehand, such as its promise to provide energy at "competitive" rates. *See* Def.'s Second Notice of Supp. Auth. at 3. But the breach of contract claim does not turn on whether Viridian's rates were "competitive;" rather, it turns on whether they varied based on wholesale market conditions, a term that has been *included* in the contract and is therefore unaffected by the integration clause.[10]

Accordingly, I **deny** the motion to dismiss the breach of contract claims.

D. Implied Covenant Claim

The Mirkins' implied covenant claim is a variation on its breach of contract claim, and is also adequately pleaded: they allege that, if Viridian did not violate any express obligation under the contract, it nevertheless exercised discretion given to it by the contract in an unreasonable or arbitrary way when it set variable rates with no obvious relationship to wholesale market prices, a key element of "wholesale market conditions." Viridian argued in its briefs that the implied covenant claim should be dismissed because New York law does not permit the plaintiffs to allege wholly duplicative breach of contract and breach of implied covenant claims. At the hearing, however, the parties agreed that the implied covenant claim could be subsumed under the breach of contract claim—that is, if the plaintiffs fail to show that Viridian directly violated an express term of the contract, but can show that it exercised discretion granted to it under the contract in an unreasonable way, then Viridian will incur liability for breach of contract.

---

[10] Viridian also attempts to argue that the relevant contractual clause does not actually limit its discretion to "wholesale market conditions," because it states that the rates "may" fluctuate based on market conditions. *See* Def.'s Br. at 33. But, as discussed in footnote 6 above, the more natural reading of the sentence, which is repeated by Viridian elsewhere in its brief, is that the rates may change from month to month, and if they do, those changes *will* be based on wholesale market conditions.

**IV.     Conclusion**

I thus **grant in part and deny in part** Viridian's motion to dismiss. (doc. 48.) I **grant** the

motion to dismiss the section 349-d(7) claim (Count One) and the implied covenant claim (Count

Five), and I **deny** the motion to dismiss the section 349 and 349-d(3) claims (Counts Two and

Three) and the breach of contract claim (Count Four).

And although it is too premature to address the issue in this case, I also note that the

surviving counts include a claim for statutory damages that the plaintiffs will likely attempt to

extend to the totality of the class. I have previously observed that such a combination could

transform statutory damages into punitive ones in a manner that raises serious due process

concerns. *See Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003); *see also*

*id.* at 27–29 (Newman, J., concurring). I urge the parties to be mindful of that issue moving

forward.

So ordered.

Dated at Bridgeport, Connecticut, this 5th day of July 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

19